𝔕𝔦𝔠𝔥𝔪𝔬𝔫𝔡.

## DAVIS V. CHAPMAN.

MARCH 24th, 1887.

*Absent*—LEWIS, P.

1. PERSONAL REPRESENTATIVES—*Devastavit.*—Administrator is chargeable with *devastavit* of loss of proceeds of draft payable to him as such, and endorsed by him for collection, and placed by him in the hands of strangers. *Kee* v. *Kee*, 2 Gratt. 116.

2. IDEM—*Claim* v. *U. S.—Collection—Surety.*—Administrator of creditor of U. S. has authority to receive payment and give discharge at any place where the government may choose to pay it, and his surety is bound. *Vaughan* v. *Northup*, 15 Pet. 6.

3. IDEM—*Creditors' Suit—Assets—Receiver.*—Court of equity has authority to call in the assets of the estate from personal representative and place them in receiver's hands. *Farmer* v. *Yates*, 23 Gratt. 145.

Appeal from two decrees of the circuit court of Fairfax county rendered at its November term, 1882, and at its June term, 1883, respectively, in the chancery cause of *Chapman* v. *Lyman Broughton and John C. Davis*. The decree was adverse to the defendants, and Davis procured from one of the judges of this court an appeal and *supersedeas*. Opinion states the case.

*H. W. Thomas* and *C. E. Stuart*, for the appellant.

*R. W. Moore* and *S. F. Beach*, for the appellee.

FAUNTLEROY, J., delivered the opinion of the court.

At the December term, 1872, of the county court of Fairfax county, Virginia, Lyman Broughton qualified as admin-

istrator *d. b. n.* of the estate of Waite Broughton, deceased, executing an official bond in the penalty of $2,000, on which the appellant, J. C. Davis, became surety.   In 1880, the appellee, John Chapman, for himself and other creditors of the said Waite Broughton, deceased, filed his bill against the said Lyman Broughton, administrator *d. b. n.* of Waite Broughton, aforesaid, and John C. Davis, surety on his official bond, for the purpose of compelling a settlement of the administration accounts of the said Lyman Broughton, administrator *d. b. n.* as aforesaid.   The bill charges that Lyman Broughton, among other claims due the estate of his intestate which came into his hands as administrator, had received a claim against the United States for damages to decedent's property during the civil war, upon which he had received the sum allowed and paid by the United States government of $2,800, for which said sum he had failed to account.

The defendants, Lyman Broughton, administrator *d. b. n.*, and his surety, J. C. Davis, the appellant, filed their separate answers to the bill, denying their liability, on the ground that, as the administrator alleges, the claim was lost through the dishonesty of the claim agents employed by him to prosecute the claim and that, as the claim was paid to the said agents by the United States government in Washington city, District of Columbia, and was never received in Virginia, he cannot be held accountable for it here.

During the progress of the cause it was referred to a master commissioner of the court to ascertain and report what amount, if any, had been collected, and by whom, on the said claim against the government, with a transcript of the record of the treasury department relating to the matter, and the deposition of the administrator himself in evidence, showing that a draft was issued July 19, 1878, for $2,800, payable to the order of Lyman Broughton, adminis-

trator, which draft was presented at the treasury, and paid, endorsed by Lyman Broughton, administrator, and by John H. Ferry. The master commissioner reported that the administrator had collected $2,800 on the said claim from the United States government July 19, 1878, and was chargeable with that sum as due the estate of his intestate, with interest thereon from the said date of its collection. To this report exceptions were filed, and the deposition of the said Lyman Broughton, administrator, denying that he had ever received the money aforesaid, and alleging that it had been lost, and he had been defrauded out of it by the dishonesty of the agents employed by him to collect it. At the November term, 1882, of the said court, the cause was heard on the bill, answers, the deposition of the administrator, Lyman Broughton, the master's report, and the exceptions thereto, a draft drawn upon the treasury of the United States in favor of Lyman Broughton, administrator, for $2,800, and other papers filed by complainant; whereupon the court decreed that 50 per centum of the said sum of $2,800 should be allowed and credited to the administrator for counsel fees and expenses of collection, and decreed against the administrator and his surety for $1,400, with interest thereon from nineteenth day of July, 1878, the date of collection, to be paid to O. W. Hunt, general receiver of the court; and by a decree of June term, 1883, leave was granted to said Hunt to institute any suit necessary to enforce the decree of the November term, 1882, aforesaid. From these decrees the surety, John C. Davis, on the adminstrator Lyman Broughton's official bond, appeals, and attacks the decrees as erroneous, for grounds of error assigned in his petition.

*First.* Because the fund which ought to have been received by the said administrator never came into his hands, but was lost by the dishonesty of the agents whom he employed to collect the claim. Other than Broughton's own

deposition, there is an entire absence of proof of dishonesty on the part of the agents whom he selected, employed, and trusted to collect this large claim due from the United States government to the estate of his intestate. A statement dated April 4, 1882, made by one Randall, and placed among the papers in the case by the appellant's counsel prior to the decree, says " Ferry was engaged in the prosecution of claims from a short time after the close of the war until he left the city, about three years ago. *Black* was regarded as a man of means, but his property was in Montana. Ferry was not regarded as a man of means, and until a short time before he left here was considered a reliable man, but since his departure there have been rumors that he fell into disfavor with the treasury department." Who Randall is, or what connection he had with Broughton, is not disclosed. Black and Ferry lived in Washington city, and were agents to prosecute claims against the government. Broughton offered no evidence, nor did he take the deposition of a single witness, to establish the allegation of dishonesty charged in his answer. Randall's statement does not belong in the record. He was never examined or cross-examined as a witness, and his statement furnishes no support to the averment of the answers. If this administrator actually realized the proceeds of this claim, which was assets of the estate in his hands, in the shape of a successfully prosecuted and allowed claim against the government, represented by a draft upon the United States treasury for $2,800, made payable to him as administrator, and which could not be used, realized, or received by any one without his endorsement, he is liable. If, as he alleges, he endorsed the draft, (and did not collect it himself, of which there is no evidence in the record,) but recklessly, negligently, and improvidently put it, so endorsed by him as administrator, into the hands of men whom he himself says he did not know, nor nothing as to their honesty or respon-

sibility, and whom he says he never "afterwards saw again," he is equally liable for the waste, upon all fixed rules controlling the administration of estates, and the responsibility of fiduciaries. In the case of *Kee* v. *Kee*, 2 Gratt. 116, this court said: "The duties of the executor are to be performed under the obligations of sound judgment, acting on these considerations of worldly prudence which affect the safety of the pecuniary interests confided to his care." See, also, *Southall* v. *Taylor*, 14 Gratt. 281.

Broughton, this administrator, says, in his deposition, of these men, Ferry and Black, whom he not only employed to prosecute this claim, but to whom he gave the draft, which was payable only to him, endorsed by him as administrator: "I did not know them; I did not know that they were reliable;" and he disclaims any knowledge of their first names, or even of their address. He did not even contract with them so as to protect the estate against exorbitant charges for prosecuting the claim, but he swears that "the first was to have twenty-five per cent.; the other man what he chose." He said that these agents said: "None of it [the proceeds of the claim] belonged to him; that it belonged to creditors of the estate; that he was not administrator; that they were administrators, and parties must come to them." He made no denial of or resistance to this absurd and sinister pretension, but parted with the realized proceeds of the claim by endorsing and delivering the draft to these men, not to collect it and to settle with him, but avowedly to exclude him from it, and (as he alleges) to retain and embezzle it entirely. He thus not only used no caution, prudence, or discretion in the transaction with these men, but he swears that he let the matter rest; that he made no effort to collect the money, or signified any desire or purpose to obtain restitution; that he has never seen or heard from these swindlers since 1878, since he endorsed and gave them the draft, and does not know

where they now are; although informed by Randall's statement that Black owned property in Montana, and that Ferry is a railroad man in New Jersey. There is abundant proof in the record, in the very deposition of the administrator himself, of his gross negligence and extraordinary imprudence and reckless dealing in regard to this transaction, and it is impossible to read the record without being impressed with the belief that this fiduciary did in fact collect and waste the fund which he now denies having received. See *McCloskey* v. *Gleason*, 56 Vt. 264; *Bradstreet* v. *Everson*, 72 Pa. St. 124.

The *second* assignment of error sets forth, as matter of law, that there is no liability upon the bond, because the claim was prosecuted in the District of Columbia, and the money, if collected, was not brought within the jurisdiction of the State of Virginia. Whatever may be the doctrine of non-liability when the personal representative collects assets from a non-resident private debtor, and does not bring them, or their converted value, within the jurisdiction where he qualified, it can have no application or relation to this case. The supreme court of the United States has repeatedly held that the federal government owing a debt must not be regarded or treated as outside of the jurisdiction where the letters of administration were granted.

In *Vaughan* v. *Northup*, 15 Pet. 6, the court said : "The debts due from the government of the United States have no locality at the seat of government. The United States, in their sovereign capacity, have no particular place of domicile, but possess, in contemplation of law, an ubiquity throughout the Union; and the debts due by them are not to be treated like the debts of a private debtor which constitute local assets in his own domicile. On the contrary, the administrator of a creditor of the government, duly appointed where he was domiciled at his death, has full

authority to receive payment, and give a full discharge, of the debt due his intestate in any place where the government may choose to pay it, whether it be at the seat of government, or at any other place where the public funds are deposited."

To the same effect is *Wyman* v. *Halstead,* 109 U. S. 654, reversing the supreme court of the District of Columbia, and held that the repeal of the act of 1812, by omission, did not alter or weaken the rule laid down in *Vaughan* v. *Northup.* The court said: "In the case at bar, neither the facts that the drafts were made payable at the treasury of United States, in the city of Washington, nor the deposit, pursuant to section 307 of the Revised Statutes, of the money represented by the drafts in the treasury to the credit of the payees, affected the character or the validity of the debts. But the United States, in their sovereign capacity, having no domicile in any part of the Union rather than in any other, do not, by establishing at the national capital a treasury for the transaction of the principal business of the financial department of the government, and making their money obligations payable there, confine their presence or their powers to this spot."

In the case of *Taylor* v. *Bemiss,* 110 U. S. 42, a fiduciary, who was appointed in Louisiana, held a Southern war claim against the government, (just such a claim as Broughton held,) in passing on the question of her liability or accountability, the court said: "We are of opinion that this appointment made it her duty to take necessary legal steps to obtain this money from the United States. She was equally bound to prosecute it with diligence, and to do all that was necessary to recover the money. The subject of such payments by the United States to administrators appointed in the States is very fully discussed in the case of *Wyman* v. *Halstead,* and upon the principle there laid down we are of opinion that payment to Mrs. Bemiss, under the

Louisiana appointment, is a valid payment, and that she is responsible under that appointment."

These cases determine that the fiduciary is bound to see to the collection of the claim; that in claims against the government no question of locality arises; that he can prosecute and collect it anywhere; and that his *bond,* wherever given, is accountable if he neglect to collect, or, having collected, if he fail to disburse and account.

The *third* and last error assigned is that the decree was rendered in favor of the general receiver of the court. In a creditors' suit against a personal representative, the court will always preserve the fund. In the case of *Farmer* v. *Yates,* 23 Gratt. 145, a decree fixing the amount of assets in the fiduciary's hands, and directing their collection by a receiver, was affirmed. Judge Moncure, in delivering the opinion, said: "In a creditors' suit, especially, it seems to be fit and proper that the court should have power to call in the assets from the hands of a personal representative. In such a suit the court, in effect, becomes the personal representative, has control of the assets, reduces them into possession, and applies them in due course of administration."

We see no error in the decrees of the circuit court of Fairfax appealed from, and they must be affirmed.

DECREES AFFIRMED.